NORENE JENKINS,                          )
                                         )
                    Plaintiff,           )
          v.                             )      Case No.  07 C 3427
                                         )
NATIONAL RAILROAD PASSENGER              )      Judge Virginia M. Kendall
CORPORATION, d/b/a AMTRAK.               )
                                         )
                    Defendant.           )
                                         )
                                         )
                                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff Norene Jenkins ("Jenkins") filed suit against Defendant National Railroad Passenger Corporation ("Amtrak") alleging various claims related to events leading up to and after she boarded an Amtrak train destined for Chicago.  This Action involves ten claims: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) negligence; (4) violation of the Americans With Disabilities Act (the "ADA"); (5) battery; (6) false imprisonment; (7) breach of contract; (8) negligent misrepresentation; (9) common law fraud; and (10) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA").  Amtrak moves to dismiss Counts I through VI and Counts VIII through X.  For the reasons stated herein, Amtrak's Motion to Dismiss Counts I through VI and Count VIII is denied.  Amtrak's Motion to Dismiss Counts IX and X is granted and Counts IX and X are dismissed with prejudice.

## PLAINTIFF'S ALLEGATIONS

Amtrak is a corporation in the business of providing railroad transportation to the public at large.  (Compl. ¶ 3.)  At all relevant times, Jenkins was an Illinois resident who had a disability that

confined Jenkins to a motorized wheelchair.  (Compl. ¶¶ 1-2.)  In August 2004, Jenkins purchased tickets to travel round-trip on Amtrak from Chicago, Illinois to Los Angeles, California.  (Compl. ¶ 5.) Jenkins and her full time assistant, Jessica Miranda ("Miranda") were scheduled to depart from Illinois on August 9, 2004 and commence their return trip from California on August 12, 2004.  (*Id.*)

Prior to August 9, 2004, Jenkins confirmed with Amtrak's "Reservation Department" that her travel accommodations would be accessible to her needs, including restrooms, dining areas, and power stations for her wheelchair, and was told that Amtrak would provide her with the necessary accommodations.  (Compl. ¶ 7.)  However, when the train departed on August 9, Jenkins discovered that she did not have access to the dining car, entertainment equipment, or communication equipment and could not access the bathroom because her motorized wheelchair did not fit in the space provided.  (Compl. ¶¶ 8, 10.)

In an effort to avoid the same problems on her return trip from Los Angeles, Jenkins contacted Amtrak customer relations prior to her August 12, 2004 departure.  (Compl. ¶ 11.)  An Amtrak customer service employee assured Jenkins that her train car would be equipped with an accessible restroom and that she would be provided with all other accommodations originally promised by Amtrak.  (*Id.*)  Nevertheless, upon boarding the train car on August 12, Jenkins learned that she could not access the restroom in her motorized wheelchair because the restroom door would not close.  (Compl. ¶ 12.)  Subsequently, Jenkins contacted an Amtrak porter ("Porter")  as well as an Amtrak supervisor ("Supervisor") and explained to them her special needs.  (Compl. ¶¶ 13-14.)  In response, the Porter and the Supervisor ordered Jenkins to remove herself from the train.  (*Id.*)  A train engineer then told Jenkins that they could not accommodate Jenkins and requested that she remove herself from the train.  (Compl. ¶ 15.)  Following this conversation, an Amtrak conductor

announced over the train's intercom system that "a handicapped lady is holding up the train because the bathroom is not accessible" and that Amtrak asked her to exit the train. (Compl. ¶ 16.) Amtrak passengers began to verbally accost and yell at Jenkins. (Compl. ¶ 17.)

Following the announcement, the Supervisor called the police and ordered them to physically remove Jenkins from the train. (Compl. ¶ 18.) In response, two policemen, upon the orders of the Supervisor and Amtrak engineer, threatened Jenkins with arrest, removal from the train in handcuffs, and destruction of her motorized wheelchair. (*Id.*) Upon the direction of Amtrak personnel, Jenkins's purse was removed from her wheelchair and its contents emptied on the ground. (Compl. ¶ 19.) Also upon direction of Amtrak personnel, Jenkins was picked up while seated in her wheelchair and "tossed off of the train." (Compl. ¶ 20.) Jenkins alleges that, by virtue of the acts of Amtrak, its employees, and the police officers Amtrak "borrowed" to deal with Jenkins, Jenkins was improperly and unlawfully restrained and/or arrested. (Compl. ¶¶ 58-59.)

The police informed Jenkins that she was banned from future travel on Amtrak pursuant to instructions from Amtrak. (Compl. ¶ 20.) Jenkins was left embarrassed, humiliated and outraged, without tickets, laying on ground next to her wheelchair, bleeding from her left hand, and wearing only one shoe. (Compl. ¶ 21.)

Jenkins alleges that, at the relevant times related to this Action, Amtrak, Amtrak employees, and the police officers under its control were in a position of power over Jenkins and knew or should have known about her disabilities and need for accommodations. (Compl. ¶¶ 25-26.) In addition, Jenkins further alleges that Amtrak knew or should have known that its actions were likely to cause emotional distress to Jenkins and that, as a result of Amtrak's conduct, Jenkins sustained severe and extreme emotional distress. (Compl. ¶ 30.) Jenkins also alleges that Amtrak was negligent in its

handling of Jenkins, her removal from the train, and her request for reasonable accommodations. (Compl. ¶¶ 35-36.)  As a result, Jenkins was physically and emotionally endangered by Amtrak's acts and suffered physical injury and illness as a result of the emotional distress caused by Amtrak. (Compl. ¶¶ 36-38.)

With regard to Jenkins's common law fraud claim, Jenkins alleges that Amtrak, during its conversations with Jenkins leading up to the August 9 and August 12 trips, misrepresented to Jenkins that the train cars used would accommodate Jenkins and her wheelchair and that Amtrak would provide Jenkins with the amenities normally offered to customers, including restrooms, dining, entertainment, comfortable seating, and communication devices.  (Compl. ¶ 76.)  Jenkins, relying on such misrepresentations, purchased Amtrak tickets, boarded the train on August 9, retained the August 12 ticket despite the service encountered on August 9, and boarded the train again on August 12.  (Compl. ¶ 80.)  With regard to the consumer fraud claim, Jenkins alleges that Amtrak unfairly deceived Jenkins by enticing her to purchase tickets and travel on Amtrak based on misrepresentations related to the provision of services.  (Compl. ¶ 84.)  Additionally, Amtrak intended that Jenkins rely on such deception, which occurred in the course of conduct involving trade and/or commerce, and utilize Amtrak's train services.  (Compl. ¶ 86.)

On August 10, 2005, Jenkins filed an action in the Circuit Court of Cook County (the "Circuit Court") against Amtrak, alleging claims stemming from the August 12, 2004 incident (the "First Action").  (Def. Ex. A, Initial Compl.)  On March 10, 2006, Jenkins voluntarily dismissed the First Action pursuant to Section 2-1009 of the Illinois Code of Civil Procedure.  (Def. Ex. B, Mar. 10, 2006 Order at 3.)  Subsequently, on August 14, 2006, Jenkins filed a Complaint for Discovery in the Circuit Court pursuant to Section 2-402 of the Illinois Code of Civil Procedure ("Respondent

in Discovery Action"). (Def. Ex. C, Compl. for Disc.) The Complaint for Discovery named Amtrak as a "Respondent in Discovery," but failed to name a person or entity as a defendant or include any specific causes of action. (*Id.* at 1-2.) Section 2-402 of the Illinois Code of Civil Procedure required Jenkins to convert Amtrak to a defendant by February 14, 2007, six months after naming Amtrak as a Respondent. (Def. Ex. D, Jan. 25, 2007 Order.) On January 25, 2007, the Circuit Court extended this deadline to April 16, 2007. (*Id.*) Subsequently, on April 16, 2007, the Circuit Court granted Jenkins's motion to convert Amtrak to a defendant and ordered Jenkins to file an amended complaint by April 26, 2007. (Def. Ex. E, Apr. 16, 2007 Order.) Jenkins filed an Amended Complaint on April 27, 2007, one day after the Court ordered deadline. (Def. Ex. F, Am. Compl.)

Subsequently, on June 18, 2007, Amtrak removed the suit to this Court and, on August 9, 2007, Jenkins filed her Second Amended Complaint.

## STANDARD

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not allege all facts involved in the claim. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Such a set of facts must

"raise a reasonable expectation that discovery will reveal evidence" of illegality. *Id.* at 1965.

## DISCUSSION

I.     Statute of Limitations (Counts I through VI and VIII)

While a defendant may raise the running of the statute of limitations, normally as an affirmative defense, in a Rule 12(b)(6) motion to dismiss, dismissal is only appropriate if allegations on the face of the complaint clearly show that the claim is time-barred.[1] *See Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 669 (7th Cir. 1998). Defendant contends that Counts I through VI and VIII are all subject to and barred by Illinois's two-year statute of limitations, as set forth in 735 ILCS 5/13-202. Jenkins does not contest that Counts I through VI and Count VIII are subject to this two-year limitations period. Instead, Jenkins argues that she timely filed the claims or, alternatively, that Amtrak waived its right to assert the statute of limitations defense due to equitable considerations. Because resolution of Amtrak's statute of limitations argument will inform the waiver analysis, the Court will address the statute of limitations argument first.

A.     *Counts I through VI Fall Outside of the Statute of Limitations Period*

i.     *Governing Statute of Limitations Periods*

Statutes of limitations are generally governed by the law of the forum state. *Wells v. Simonds Abrasive Co.,* 345 U.S. 514, 517 (1953). As a result, this Court will apply Illinois law regarding the relevant limitations periods. As noted above, Amtrak contends, and Jenkins does not

---

[1] For the purpose of resolving Amtrak's statute of limitations argument, the Court will take judicial notice of the public filings that document Jenkins's journey through the Circuit Court, prior to removal of the Action on August 9, 2007. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (*quoting United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991) ("'The district court may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment."). The Court notes, however, that its ultimate conclusion regarding the statute of limitations would not change had it instead converted this Motion to one for summary judgment. The parties have had a  reasonable opportunity to present all the material that is pertinent to this issue and the facts reveal that Jenkins failed to timely file Counts I-VI.

contest, that Counts I through VI and VIII are all subject to and barred by Illinois's two-year statute of limitations period, as set forth in 735 ILCS 5/13-202. Under Section 13-202, "Actions for damages for an injury to the person, or for false imprisonment . . . shall be commenced within 2 years next after the cause of action accrued." 735 ILCS 5/13-202. As relevant to this Action, the two-year limitations period applies to the following claims: (1) intentional infliction of emotional distress; (2) negligent infliction of emotion distress; (3) negligence; (4) violations of the ADA; (5) battery; and (6) false imprisonment. *See Pavlik v. Kornhaber*, 761 N.E.2d 175, 182, 186 (Ill. App. Ct. 2001) (intentional infliction of emotional distress and negligence); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996) (ADA claim); *Hollander v. Brown*, No. 05 C 0057, 2005 U.S. Dist. LEXIS 13601, at *7 (N.D. Ill. June 28, 2005) (battery). Section 13-202 does not, however, apply to Jenkins's's negligent misrepresentation claim (Count VIII). Instead, this latter claim is subject to a five-year limitations period under 735 ILCS 5/13-205. *See Bachman v. Bear, Stearns & Co.*, 57 F. Supp. 2d 556, 559 (N.D. Ill. 1999). Because the Complaint reveals that Jenkins's filed her negligent misrepresentation claim within five years after the cause of action accrued, Amtrak's Motion to Dismiss is denied as to Count VIII.

ii.     *Jenkins failed to file Counts I through VI within the applicable limitations period*

As noted above, Section 13-202 requires a party to commence all actions "for damages for an injury to the person, or for false imprisonment" within two years after the cause of action accrued. 735 ILCS 5/13-202. A plaintiff may voluntarily dismiss such action without prejudice at any time before the trial or hearing begins, provided that the plaintiff complies with the requirements set forth in Section 2-1009(a) of the Illinois Code of Civil Procedure. 735 ILCS 5/2-1009. Where a case has been voluntarily dismissed, a party may commence a new action within one year after the dismissal

or within the remaining period of limitation, whichever is greater. 735 ILCS 5/13-217. In this case, the causes of actions that form the bases of Counts I through VI allegedly accrued on August 12, 2004.[2] Jenkins commenced the First Action on August 10, 2005, well within the two-year limitations period required under Section 13-202. Jenkins's voluntary dismissal of First Action on March 10, 2006 triggered the one-year limitations period extension set forth under Section 13-217. Thus, Jenkins was required to re-file her suit by March 10, 2007. This Action was not filed, however, until one month after the limitations period ended on April 27, 2007. Consequently, Jenkins's Complaint reveals that she failed to timely file this Action.

Jenkins, citing to her Complaint for Discovery, contends that she commenced "the instant action" on August 14, 2006 when she filed the Complaint for Discovery. A complaint for discovery is authorized by Section 2-402 of the Illinois Code of Civil Procedure. Section 2-402, which creates a "procedural right" that "opens the door to a substantive right of broad discovery," *Hugley v. Alcaraz*, 494 N.E.2d 706, 710 (Ill. App. Ct. 1986), provides, in pertinent part, "The plaintiff in any civil action may designate as respondents in discovery in . . . [the] pleading those individual or other entities, other than the named defendants, believed by the plaintiff to have information essential to the determination of who should properly be named as additional defendants in the action." 735 ILCS 5/2-402. A respondent in discovery is not a party to a lawsuit. *Allen v. Thorek Hosp.*, 656 N.E.2d 227, 233 (Ill. App. Ct. 1995). The respondent may be made a defendant in the cause of action even after the limitations period for that cause of action has run, as long as the plaintiff moves the court to convert the respondent into a defendant within the six month period following his having been named a respondent in discovery or, upon a showing of good cause, an extended period of time.

_____

[2] The parties agree that the relevant causes of action accrued on August 12, 2004 and the Court finds no reason to question this conclusion. (*See* Compl. at ¶¶ 29, 36, 47-48, 51-52, 58; Pl. Opp. Br. at 6; Def. Mem. Supp. Mot. at 2.)

735 ILCS 5/2-402.

According to the Illinois Supreme Court, a complaint for discovery that names a defendant and respondents but fails to charge the respondents with actionable conduct or seek damages from them does not constitute a complaint at law as to the respondents. *See Murphy v. Giardina*, 413 N.E.2d 399, 401 (Ill. 1980) (complaint for discovery naming a defendant and respondents but failing charge the respondents with actionable conduct is not a new cause of action). Instead, the complaint for discovery is "simply a discovery device." *Id.*; *see also Hugley*, 494 N.E.2d at 710. Furthermore, while section 2-402 does not explicitly mandate the naming of a party defendant in the complaint for discovery, Illinois courts have consistently concluded that the failure to name a party defendant is fatal to the discovery action. *See, e.g.*, *Bogseth v. Diamond*, 655 N.E.2d 888, 891 (Ill. 1995) (Section 2-402 "requires a plaintiff to name a real person or entity as a defendant"); *Gonzales v. Pro Ambulance Serv.*, 579 N.E.2d 1184, 1186-87 (Ill. App. Ct. 1991) (Section 2-402 "requires naming at least one party as a defendant"); *Jacobs v. Abbott Labs.*, 572 N.E.2d 1231, 1232 (Ill. App. Ct. 1991) (failure to name defendant rendered complaint for discovery fatally defective).

Drawing on the principles stated above, Amtrak contends that the Complaint for Discovery does not shield these claims from the statute of limitations bar. In support of this argument, Amtrak cites to *Bogseth v. Emanuel*, 655 N.E.2d 888 (Ill. 1995). In *Bogseth*, the Illinois Supreme Court was confronted with a set of consolidated appeals in which the plaintiffs filed a complaint for discovery, naming as the sole defendant a fictitious "John Doe" in addition to named respondents in discovery. *Id.* at 890. Within the six-month time period allotted, the plaintiffs converted the respondents in discovery to defendants. *Id.* Thereafter, the converted defendants in both cases filed a motion to dismiss, asserting that the court never had subject matter jurisdiction over the cause because, in

9

bringing the action against "John Doe," the plaintiff did not comply with Section 2-402. *Id.* On appeal to the Illinois Supreme Court, the *Bogseth* court agreed. The *Bogseth* court reiterated that section 2-402 requires a plaintiff to name a real person or entity as defendant and that suits brought against fictitious parties are void *ab initio*. *Id.* at 891. Underlying this prohibition is the principle that a court may only entertain jurisdiction over matters in controversy between an actual plaintiff and actual defendant. *Id.* at 892. Additionally, if the court noted its concern that if it "were to countenance 'John Doe' lawsuits, plaintiffs could, pursuant to section 2-402, obtain a six-month extension of this statutory period simply by filing a complaint against a 'John Doe' and a respondent in discovery on the final day of the two-year limitations period." *Id.*

As illustrated by *Bogseth,* the filing of a procedurally deficient complaint for discovery does not constitute a valid cause of action. *Bogseth* further suggests that, when the plaintiff fails to initially name a defendant in the complaint for discovery, a court does not entertain jurisdiction over the matter and that a timely conversion of respondents to defendants will not transform the invalid discovery action into a valid cause of action. *See, e.g. Jacobs*, 572 N.E.2d at 1232-33 (affirming lower court conclusion that discovery complaint was "fatally defective" because plaintiff failed to name a defendant). In the current Action, Jenkins's Complaint for Discovery was fatally defective because, although she named Amtrak as a respondent, she failed to name a defendant. In addition, the Complaint for Discovery did not include any legal claims. Thus, neither the August 14, 2006 filing of the Complaint for Discovery nor the related March 10, 2007 Motion to Convert Amtrak to a Defendant constitute a valid cause of action that would satisfy the statute of limitations.

Jenkins next contends that her failure to name a defendant in its Complaint for Discovery is a procedural, rather than jurisdictional, issue and that this error would, at most, subject the discovery

action to an attack for failure to state a claim. The Court disagrees for three reasons. First, as noted above, the failure to name a defendant in a discovery action is a jurisdictional issue that deprives the court of subject matter jurisdiction. *See Bogseth*, 655 N.E.2d at 891-92; *Gonzales*, 579 N.E.2d at 1187. Second, as *Bogseth* suggests, a complaint naming only respondents in discovery is not a complaint at law. *Bogseth*, 655 N.E.2d at 891-92; *Gonzales*, 579 N.E.2d at 1186. Third, to the extent that Jenkins places the onus on Amtrak to have dismissed the Complaint for Discovery, Jenkins misapplies the law. Respondents in discovery are not parties to the action in which they are names and cannot seek dismissal of a discovery action in Illinois state court. *Shanklin v. Hutzler*, 691 N.E.2d 7, 13 (Ill. App. Ct. 1997) (non-party respondents in discovery improperly filed a motion to dismiss because "section 2-402 expressly permits respondents in discovery to file a motion to convert themselves into defendants, but is silent regarding any other motion").

Thus, for the reasons stated above, the Court concludes that Jenkins's August 14, 2006 Complaint for Discovery was not a "cause of action" and that neither the August 14, 2006 filing or the related March 10, 2007 filing of a Motion to Convert Amtrak satisfy the relevant limitations rules. As such, Jenkins failed to timely file Counts I through VI.[3]

B.      *Amtrak may be estopped from raising the statute of limitations defense*

The Court's conclusion that Jenkins failed to timely file Counts I through VI does not end the Court's analysis. In Plaintiff's Response to Motion to Dismiss, Jenkins further asserts that Amtrak's statute of limitations defense is barred by equitable considerations. (Pl. Resp. Mem. 4.) Specifically, Jenkins contends that Amtrak previously waived its right to raise the

---

[3] Amtrak submits multiple theories in support of its argument that Counts I through VI are time-barred. Because the Court concludes that the filing of the Complaint for Discovery does not shield Jenkins from the statute of limitations bar, the Court need not address Amtrak's alternate arguments.

statute of limitations defense.[4]  (Pl. Resp. Mem. 4-6.)

Under Illinois law, waiver is generally defined as "the voluntary and intentional relinquishment of a known right by conduct inconsistent with an intent to enforce that right."  *See Ciers v. O.L. Schmidt Barge Lines, Inc.*, 675 N.E.2d 210, 213 (Ill. App. Ct. 1996).  Jenkins does not rely on this traditional principle.  Instead, Jenkins appears to limit her arguments regarding waiver to a theory of "waiver by estoppel."  *See Marks v. Johnston City*, 315 N.E.2d 342, 343 (Ill. App. Ct. 1974).  Under this theory, a defendant may be barred from asserting the statute of limitations defense if, through his conduct, the defendant caused the plaintiff "to change [her] position by lulling [her] into a false sense of security thereby causing [her] to delay or waive [her] rights."  *Id.* (*citing Dickirson v. Pac. Mutual Life Ins. Co.*, 150 N.E. 256 (Ill. 1925)); *see also Cange v. Stotler & Co.*, 826 F.2d 581, 588 (7th Cir. 1987).  The "waiver by estoppel" defense is based on the doctrine of equitable estoppel rather than the traditional waiver doctrine.[5]  *See Salloum Foods & Liquor, Inc. v. Parliament Ins. Co.*, 388 N.E.2d 23, 27 (Ill. App. Ct. 1979) ("In the context of insurance law, and especially with regard to limitation provisions in insurance policies, the terms 'waiver' and 'estoppel' have often been used without careful distinction, and thereby abused and confused.  This doctrinal confusion, epitomized by the frequently echoed phrase 'waiver by estoppel,' is so deeply

---

[4] When asserting this defense, Jenkins assumes that Illinois law applies with equal force to her state law claims (Counts I, II, III, and V) and her federal ADA claim (Count IV).  Amtrak does not dispute this assumption.  Nevertheless, the Court notes that "[w]here the federal court is applying a (borrowed) state statute of limitations, the federal doctrine of equitable estoppel, not the state doctrine, controls." *Shropsear v. Corp. Counsel of the City of Chicago*, 275 F.3d 593, 598 (7th Cir. 2001).  In this case, the Court borrowed the Illinois two-year statute of limitations period to determine whether the limitations period ran with respect to Jenkins's ADA claim.  Thus, Jenkins must establish the federal doctrine of equitable estoppel rather than the Illinois equitable estoppel defense with respect to this claim.

[5] The "waiver by estoppel" theory is generally applied in the context of insurance claims cases, where the insurer causes the insured to delay filing suit by creating a false sense of security as to the possibility of settlement. *See Cange v. Stotler & Co.*, 826 F.2d 581, 588 (7th Cir. 1987).  Nevertheless, a few courts have applied this theory to cases outside the insurance claims arena. *See, e.g., Serafini v. Chicago Transit* Auth., 393 N.E.2d 1120 (Ill. App. Ct. 1979); *Cange*, 826 F.2d at 588.

rooted some courts have suggested that the term waiver, as applied in Illinois to insurance cases is simply another name for estoppel. Notwithstanding the confusion already engendered by many of these cases, it is elementary that waiver and estoppel are two separate and distinct doctrines.") (internal citations omitted); *see also Cange*, 826 F.2d at 588 (characterizing waiver by estoppel as an equitable estoppel defense). Thus, the Court interprets Jenkins' waiver arguments as limited to the equitable principles of estoppel.[6]

Jenkins waiver by estoppel argument is based primarily upon her contention that Amtrak "waived" its statute of limitations defense during a September 2006 conversation between counsel for Jenkins, Troy Lundquist ("Lundquist"), and counsel for Amtrak, Susan Laing ("Laing"). (Pl. Resp. Mem. 4-5.) According to Jenkins, Lundquist and Laing entered into a discussion regarding discovery, settlement, and their respective concerns regarding the statute of limitations and a timely removal to federal court. (Pl. Resp. Mem. 4-5.) Jenkins further contends that, at the close of this discussion, the parties agreed that "Amtrak would not assert statute of limitations defenses and Jenkins would [not] oppose removal of this case to federal court."[7] (Pl. Resp. Mem. at 5.) Laing also agreed to provide discovery pursuant to the Complaint in Discovery and to discuss settlement, but allegedly failed to cooperate as the matter proceeded. (Pl. Resp. Mem. 5-6.) Jenkins argues that

---

[6] Specifically, Jenkins asserts: "Amtrak's actions agreeing to provide discovery and discuss settlement, yet failed to respond to inquiries should also trigger equitable considerations against its argument based upon the statute of limitations." (Pl. Resp. Mem. 5-6.) The Court does not interpret this as a separate and distinct equitable estoppel argument. Instead, the Court will take this into consideration when analyzing Jenkins's waiver by estoppel argument. This conclusion is reinforced by the sub-heading of this section of Jenkins's's memorandum ("Amtrak . . . has Waived the Statute of Limitations Defense"), repeated references to "waiver," and the noticeable absence of an reference to "equitable estoppel" within this section.

[7] It is unclear from the evidence and arguments submitted whether the terms of the alleged agreement stated that: (1) Jenkins would "*[not] oppose* removal of the case to federal court" ( Pl. Resp. Mem. at 5), (2) stated that *Amtrak could file for removal* after the 30 days allowed by the statute, (Def. Reply Mem. at 5); (3) Jenkins would "*not object*[] . . . to the 30-day removal period," (Def. Ex. B, Lundquist Dep. at 24); or (4) Amtrak could "*extend[ ]* . . . [t]he timeline to remove the case," (Def. Ex. B, Lundquist Dep. at 35).

Laing's statements created a false sense of security that the statute of limitations would not be an issue. Additionally, as a result of her reliance on Amtrak's agreement to explore her settlement and Amtrak's failure to file pleadings or raise objections to the discovery action, Jenkins did not seek any further relief until she converted Amtrak from a Respondent in Discovery to a Defendant. (Pl. Resp. Mem. 6.) In response, Amtrak contends that Laing did not enter into such an agreement with Lundquist and denies that it waived its statute of limitations defense.

As a preliminary matter, the Court must address the parties' use of extrinsic evidence to support their arguments regarding waiver. When Jenkins filed her Response to Amtrak's 12(b)(6) Motion to Dismiss, she attached several items of documentary evidence, including a deposition transcript for Laing and an affidavit executed by Lundquist. (Pl. Ex. 1, Laing Dep. at 8; Pl. Ex. 2, Lundquist Aff. at 1.) In Defendant's Reply In Support of Its Motions to Dismiss, Amtrak also attached a deposition transcript for Lundquist. (Def. Reply Ex. A, Lundquist Dep.) Under Federal Rule of Civil Procedure 12(b)(6), a Court may dismiss a cause of action for failure to state a claim upon which relief can be granted when, after reviewing the complaint and taking all factual allegations in the complaint as true, the claim reveals no viable cause of action. *See Greene v. Finley*, 749 F.2d 467, 468 (7th Cir. 1984). When a party refers to matters outside the pleading in connection with the motion to dismiss, the court may convert the motion to a motion for summary judgment and analyze the evidence under the standard of Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. Pro. 12(d). The relevant portion of Rule 12 states as follows:

> If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

*Id.* In other words, a court has two options when the parties present matters outside of the pleading on a Rule 12(b)(6) motion: exclude consideration of the matters outside the pleadings or convert the motion to one for summary judgment.

In the present case, both parties have presented evidence outside the pleadings. The Court could exclude the documents and proceed to analyze the motion under the Rule 12(b)(6) standard, or it may consider the documents submitted and rule on the motion as one for summary judgment. The current issue - whether Amtrak is estopped from raising a statute of limitations defense - relates to six of the ten claims filed in the case. Resolution of this issue will greatly affect the manner in which the parties proceed. As such, the Court will not exclude the documents and will convert the current motion into a partial motion for summary judgment.[8]

Because the Court chooses to convert the current Motion to one for summary judgment, the federal rules require that the Court give the parties "reasonable opportunity to present all material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Both Jenkins and Amtrak filed extrinsic evidence in connection with their respective responsive motions and relied on this extrinsic evidence throughout their arguments regarding waiver and estoppel. However, the manner in which they have presented their evidence and argument leads the Court to believe that the parties have not had a "reasonable opportunity" to present all pertinent material.

The resolution of Jenkins's equitable estoppel claim turns on the narrow factual question of whether Amtrak's conduct deterred Jenkins from timely filing suit. Accordingly, Jenkins is given until January 31, 2008 to submit any additional material in support of summary judgment based on the statute of limitations, including a Local Rule 56.1 statement. Amtrak has until February 21,

---

[8] The conversion relates only to the issue of whether Amtrak is estopped from raising a statute of limitations defense. The Court will consider the remaining arguments and issues under the traditional Rule 12(b)(6) standard.

2008 to respond. Any reply is due March 6, 2008.

II.      Failure to State a Claim (Counts I, II, and VI)

Amtrak also contends that Jenkins fails to state a claim for intentional infliction of emotional distress (Count I), negligent infliction of emotional distress (Count II), and false imprisonment (Count VI). As discussed below, the Court concludes that Jenkins has sufficiently pled each of these claims.[9]

A.      *Intentional Infliction of Emotional Distress (Count 1)*

In order to state a claim for intentional infliction of emotional distress, the plaintiff must show: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 866 (Ill. App. Ct. 2000). Such a claim is actionable only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (*quoting* Restatement (Second) of Torts § 46 cmt. d (1965)). The Court should consider whether the plaintiff is "particularly susceptible to emotional distress because of some physical or mental condition." *Honaker v. Smith*, 256 F.3d 477, 492 (7th Cir. 2001). With respect to the third element, the distress suffered must be such that no reasonable person could be expected to endure it. *Davis*, 360 N.E.2d at 90. In many cases, the defendant's extreme and outrageous conduct may be evidence that the distress existed, even when the plaintiff fails to present significant evidence as to the severity of the emotional distress. *Honaker*, 256 F.3d at 496 (*citing Wall v. Pecaro*, 561 N.E.2d 1084, 1088 (Ill.

_____

[9] Neither party disputes that Illinois law applies to Counts I, II, and VI.

16

App. Ct. 1980)) ("[T]he very nature of the conduct involved may be evidence of its impact on the victim.").

Amtrak contends that Count I fails to state a claim because Jenkins failed to plead sufficient facts demonstrating that she suffered the requisite level of emotional distress. Specifically, Amtrak argues that Jenkins alleges only the legal conclusion that she "sustained severe and extreme emotional distress." The Court disagrees and concludes that, under the liberal pleading requirements of Rule 8, Jenkins has provided sufficient factual allegations to state a claim for IIED. Jenkins alleges that Amtrak, its various employees and law enforcement officers held a position of power of Jenkins and knew or should have known of Jenkins' vulnerabilities and that their actions were likely to cause emotional distress to Jenkins. (Compl. ¶¶ 25-26.) She described the extreme and outrageous conduct, which included announcing to all the train passengers that "a handicapped lady" was delaying the train's departure, ordering policemen to throw her off the train, and throwing her medication on the ground when she was "tossed off of the train." (Compl. ¶¶ 16-22, 29.) Finally, she has alleged that this conduct left her embarrassed, humiliated and outraged, and caused severe and extreme emotional distress. The latter allegations, when considered in conjunction with the allegations regarding the incident at issue and Amtrak's alleged conduct, plausibly suggest that Jenkins is entitled to relief.

B.      *Negligent Infliction of Emotional Distress (Count II)*

With respect to Count II, Amtrak finds fault with the sufficiency of Jenkins' allegations regarding the existence of a duty owed by Amtrak to Jenkins and a breach of that duty. (Def. Mem. 10.) Amtrak correctly argues that, to succeed on a negligent infliction of emotional distress claim, the plaintiff must show that: (1) the defendant owed plaintiff a duty, (2) the defendant breached this

duty; and (3) this breach proximately caused the plaintiff's injury. *See Parks v. Kownacki*, 737 N.E.2d 287, 296-97 (Ill. 2000). While Jenkins does not expressly state that Amtrak "owed a duty" to Jenkins and "breached this duty," she includes sufficient allegations regarding her status as a passenger on Amtrak and their allegedly negligent treatment. *See, e.g., Fillpot v. Midway Airlines*, 633 N.E.2d 237, 242 (Ill. App. Ct. 1994) ("Common carriers have a duty to exercise the highest standard of care in protecting their passengers."). Jenkins alleged that Amtrak knew or should have known of Jenkins' vulnerabilities and that their actions were likely to cause Jenkins emotional distress. She further explained that Amtrak negligently mishandled Jenkins's request for accommodations and her removal from the train. Finally, Jenkins alleges that, as a result of the negligent acts and extreme and outrageous conduct, Jenkins suffered physical injury and illness. Thus, the Court concludes that Jenkins has included sufficient allegations to create a plausible entitlement to relief as to Count II.

## C.     *False Imprisonment (Count VI)*

False imprisonment is defined as "an unreasonable restraint of an individual's liberty against his will caused or procured by the defendant." *Hajawii v. Venture Stores, Inc.,* 465 N.E.2d 573, 576 (Ill. App. Ct. 1984). The unlawful restraint may be effected by words alone, physical acts alone, or by both. *See Marcus v. Liebman*, 375 N.E.2d 486, 488 (Ill. App. Ct. 1978). Amtrak contends that Count VI fails to state a claim for false imprisonment because Jenkins has alleged only that she was asked to leave the train and not that she was confined or restrained. (Def. Mem. 10.) However, the allegations set forth in the Complaint negates this argument. Specifically, Jenkins alleges that, upon the direction of Amtrak personnel, Jenkins was "picked up while she was still seated in her [motorized wheelchair] . . . and tossed off of the train." (Compl. ¶ 20.) Therefore, Amtrak's motion

18

to dismiss Count VI for failure to state a claim is also denied.

III.     Federal Preemption under 49 U.S.C. § 24301(g) (Counts IX and X)

Amtrak next argues that Jenkins' common law fraud and consumer fraud claims (Counts IX and X) are preempted by the Amtrak Act, 49 U.S.C. § 24301(g). In light of the general principles governing federal preemption, the objectives of the Amtrak Act, the language of 49 U.S.C. § 24301(g), and the allegations surrounding Jenkins' common law fraud and consumer fraud claims, the Court concludes that Counts IX and X are preempted by the Amtrak Act.

A.     *General preemption rules*

The Supremacy Clause of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land." U.S. Const., art. VI, cl. 2. Under the Supremacy Clause, federal law preempts state law in three circumstances: (1) when Congress explicitly defines the extent to which its statute preempts state law ("express preemption"); (2) when state law attempts to regulate conduct in a field that Congress intended the federal government to occupy exclusively ("field preemption"); or (3) when state law actually conflicts with federal law ("conflict preemption"). *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). With any preemption, "the ultimate touchstone" is congressional purpose. *Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 189 F.3d 633, 637 (7th Cir. 1999). "[W]here federal law is said to bar state actions in fields of traditional state regulation,. . . [the Court works with] the assumption that the historic powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (internal quotations omitted).

The party advocating preemption bears the burden of proof. *See Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). In this case, the issue is whether 49 U.S.C. § 24301(g) expressly preempts Illinois law. Thus, the Court will begin its analysis with the plain wording of the express preemption clause because it is the wording that best reflects Congress' intent. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), *superseded on other grounds by statute*, Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266 (2007), ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent").

B.      *Preemption under 49 U.S.C. § 24301(g)*

Amtrak is regulated by Congress via the Amtrak Act ( the "Act"), 49 U.S.C. § 24101 et seq. As relevant to this case, the Amtrak Act contains the following express preemption provision: "A State or other law related to rates, routes, or service does not apply to Amtrak in connection with rail passenger transportation." 49 U.S.C. § 24301(g). Amtrak contends that Counts IX and X are preempted by 49 U.S.C. § 24301(g) because the claims "relate[] to . . . service." The critical phrase - "relate[] to . . . service" – is not self-defining. Thus, the Court must decide: (1) whether the allegations underlying the common law fraud and consumer fraud claims fall under the "services" umbrella and (2) if so, whether such claims are "related to. . . service."

*i. The allegations underlying Counts IX and X concern "services"*

Amtrak argues that Counts IX and X are preempted by the Amtrak Act because they "relate[] to" Amtrak's provision of "services" in connection with rail passenger transportation. The Amtrak Act is silent as to the meaning of "service" and, while a handful of courts have applied this

preemption provision, courts have yet to set forth the definitional parameters of the term. *See, e.g., Nat'l R.R. Passenger Corp. v. Miller*, 358 F. Supp. 1321, 1329 (D. Kan. 1973), *aff'd,* 414 U.S. 948 (1973) (concluding that "services" should not be interpreted to include the serving of liquor within a state if such service would violate the state's regulations, thereby violating a constitutional amendment).

The Seventh Circuit has, however, thoroughly discussed the meaning of the term "service" in the context of the Federal Airline Deregulation Act ("FADA"), a federal transportation statute containing a similar preemption provision. The FADA prohibits states from enacting or enforcing state enforcement actions "related to a price, route, or service of an air carrier that may provide air transportation." 49 U.S.C. § 41713(b)(1). When applying this provision, the Seventh Circuit has adopted the following broad definition of "service":

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another . . . . [This] leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

*Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996) (*quoting Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995)). Thus, intentional tort claims that expressly refer to ticketing and the transportation itself are claims that fall under the "services" umbrella. *Id*. at 1434.

The Court finds this definition instructive and can see no reason to construe the Amtrak Act's use of the term "service" any different than another statute that uses similar language to regulate a separate transportation industry. This conclusion is reinforced by the legislative history of the

Amtrak Act, which reveals that the term "service" should be construed broadly. *See* Rail Passenger Service Act of 1970, Pub. L. 91-518, § 201, 84 Stat. 1328, 1329 (1970) (current version at 49 U.S.C. § 24101) ("[T]he Secretary . . . is directed and authorized to submit . . . recommendations for the basic system . . . [including] basic service characteristics of operations to be provided within the basic system, taking into account schedules, number of trains, connections through car service, and sleeping, parlor, dining, and lounge facilities."); H.R. Rep. No. 91-1580, at 7 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 4735, 4741-42 (same).

In this case, the facts underlying Jenkins' common law fraud and consumer fraud claims fall under the "service" umbrella, as defined above. With respect to Jenkins's common law fraud claim (Count IX), Jenkins alleges that Amtrak's Reservation Department misrepresented to Jenkins that the train cars utilized for her journey would accommodate her and her motorized wheelchair and that Amtrak would provide Jenkins with the amenities normally afforded to Amtrak customers, including restrooms, dining, entertainment, comfortable seating and communication devices. (Compl. ¶ 76.) She further alleges that Amtrak successfully induced Jenkins to purchase the tickets and travel via Amtrak's trains "despite initial [improper] service." (Compl. ¶ 80.) Such allegations concern the contractual arrangement between Jenkins and Amtrak as well as the fulfillment of that agreement. *See Travel All Over the World, Inc.*, 73 F.3d at 1433. With respect to the consumer fraud claim, Jenkins alleges that Amtrak enticed Jenkins to purchase tickets and travel on Amtrak's trains through misrepresentation related to the provision of appropriate accommodations for Jenkins, her disability, and her motorized wheelchair. (Compl. ¶ 84.) Further, Amtrak intended that Jenkins rely on the aforementioned deceptive and unfair business practices, which occurred in the course of conduct involving trade and/or commerce, and utilize Amtrak's services. Again, Jenkins'

allegations are founded on the creation of a contractual arrangement between Jenkins and Amtrak based on Amtrak's misrepresentations, deception that occurred in the course of trade or commerce, as well as the anticipated provision of labor and services during travel.

*ii. Jenkins' consumer fraud and common law fraud claims "relate[] to" service*

*a. "Relates to" standard*

While a majority of courts have yet to explicitly define and apply the "relates to" phrase in the context of 49 U.S.C. § 24301(g), the Supreme Court has repeatedly examined this phrase in the context of the Employee Retirement Income Security Act ("ERISA"),[10] which preempts state laws that "relate to" ERISA benefit plans.[11] *See Haynes v. Amtrak*, 423 F. Supp. 2d 1073, 1080-81 (C.D. Cal. 2006). In that context, the Supreme Court has noted that, "If the 'related to' phrase were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop nowhere.'" *Travelers,* 514 U.S. at 655. Nevertheless, such a concern does not categorically exclude from the risk of preemption all state law tort claims. *See, e.g., Cal. Div. of Labor Standards Enforcement v. Dillingham Construc., N.A., Inc.*, 519 U.S. 316, 325-26 (1997)) (noting that a common law claim premised on the existence of an ERISA plan may be preempted). Rather, in light of such a concern, the Supreme Court has created the following two-part inquiry to determine whether a law "relates to" ERISA

----

[10] The relevant ERISA preemption provision states as follows: "[T]he provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a).

[11] The Supreme Court has also interpreted the "relates to" phrase in the context of the FADA, which prohibits state enforcement actions "related to a price, route, or service, of an air carrier. In doing so, the Supreme Court adopted the "relates to" standard it previously set forth when interpreting the preemption provision of ERISA. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). While the Supreme Court has continued to refine the "relates to" standard in the ERISA context, it has yet to similarly revise its initial adoption and interpretation of the "relates to" standard in the context of the FADA. Consequently, this Court will focus on the "relates to" standard as interpreted by the Supreme Court and Seventh Circuit in the context of ERISA's preemption provision rather than that of the FADA.

benefit plans: a law "relates to" an ERISA benefit plan if it has a connection with or reference to such a plan. *Travelers*, 514 U.S. at 656 (*citing Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983)). To determine whether a state law has a "connection with" such a plan, courts look to "'the objectives of the. . . statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (internal citations omitted) (*citing N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 658-59 (1995)). Preemption does not extend to state laws having only a tenuous, remote, or peripheral connection with a plan, which is the case with many laws of general applicability. *Travelers*, 514 U.S. at 661. The relevant language of ERISA is identical to that of the Amtrak Act. Therefore, the Court will adopt the same standard here: any State or other law having a connection with, or reference to, Amtrak's provision of service in connection with rail passenger transportation is preempted under 49 U.S.C. § 24301(g).

*b. Objectives of the Amtrak Act*

Because the Court must consider the objectives of the Amtrak Act when conducting the "relates to" preemption analysis, the Court begins with an examination of the history and purpose of the Amtrak Act.

Amtrak was created by Congress in the Rail Passenger Service Act of 1970 ("RPSA"), Pub. L. 91-518, 84 Stat. 1328 (1970) (current version at 49 U.S.C. § 24101), which was subsequently amended and recodified under 49 U.S.C. § 24101 et seq.[12] Congress established Amtrak to create a uniform, national rail passenger system and "avert the threatened extinction of passenger trains

_____

[12] As noted above, the RPSA has been amended several times and was subsequently recodified under 49 U.S.C. § 24101 et seq. For purposes of this Motion, the Court will refer to the original version of the Rail Passenger Service Act of 1970 as the RPSA and the most recent version, as codified under 49 U.S.C. § 24101 et seq, as the Amtrak Act.

in the United States."  Rail Passenger Service Act of 1970 § 101; *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383 (1995); H.R. Rep. No. 91-1580, at 1.  This focus on creating a uniform national rail transportation system and securing the survival of rail passenger transportation is evident from the text of the RPSA as well as its legislative history. The RPSA begins with a set of congressional findings, including:

> [That] modern, efficient, intercity railroad passenger service is a necessary part of a balanced transportation system; that the public convenience and necessity require the continuance and improvement of such service to provide fast and comfortable transportation . . . ; that rail passenger service can help to end the congestion on our highways and the overcrowding of . . . airports; that the traveler in America should . . . have freedom to choose the mode of travel most convenient to his needs; [and] . . . to achieve these goals requires the designation of a *basic national rail passenger system.*

Rail Passenger Service Act of 1970 § 101 (emphasis added).  Section 201 of the RPSA directed the Secretary of Transportation to submit to the Interstate Commerce Commission and Congress his preliminary report setting forth recommendations for the basic national rail passenger system,  Rail Passenger Service Act of 1970 § 201, and Section 801 authorized the Interstate Commerce Commission to prescribe regulations it considered necessary to provide adequate and safe service, equipment, and facilities.  Rail Passenger Service Act of 1970, § 801(a)(3).  Section 306(a) of the RPSA exempted Amtrak from any provision of the Interstate Commerce Act pertaining to the "regulation of routes and service."   Rail Passenger Service Act of 1970 § 306(a)(3).  Finally, Section 306(c) - currently codified as § 24301(g) - further established that "[Amtrak] shall not be subject to any State or other law pertaining to the transportation of passengers by railroad is it relates to rates, routes, and services."   Rail Passenger Service Act of 1970 § 306(c); *see also* H.R. Rep. No. 91-1580, at 9 ("The Corporation is not subject to any state or other law pertaining to passenger

transportation by railroads.").

The Committee on Interstate and Foreign Commerce (the "Committee") noted many of the same findings in its Report regarding the RPSA as set forth in § 101 of the RPSA. *See* H.R. Rep. No. 91-1580, at 2-4. The Committee also attributed the "downward trend in passenger train usage" to, among other things, the railroads "downgrading service in a deliberate attempt to support elimination of passenger trains," H.R. Rep. No. 91-1580, at 3, and stated that, in order to "save" any rail passenger service, the service has to be "organized into a *cohesive system* requiring management which takes into consideration the *needs and abilities of the entire system* which will be a *replacement for the diverse managements of the present unintegrated . . .* passenger service." H.R. Rep. No. 91-1580, at 3 (emphasis added). With the creation of a "unified system," Amtrak would achieve immediate improvements in areas including ticketing and reservations. H.R. Rep. No. 91-1580, at 3.

The continued focus on the maintenance of an efficient national system is evidenced by the current purpose, findings, and goals of the Amtrak Act as well as the Act's multiple preemption provisions. The stated purpose of the Amtrak Act is to "provide intercity and commuter rail passenger transportation that completely develops the potential of modern rail transportation to meet the intercity and commuter passenger transportation needs of the United States" through the use of innovative operating and marketing concepts. 49 U.S.C. § 24101(b). In addition, the Amtrak Act contains multiple Congressional findings reminiscent of those that spurred the initial enactment of the RPSA. For instance, the findings listed under 49 U.S.C. § 24101(a) include: (1) "*[p]ublic convenience and necessity* require that Amtrak . . . provide modern, cost-efficient, and energy-efficient intercity rail passenger transportation between crowded urban areas and in other

areas of the United States"; (2) "[a] traveler in the United States should have the greatest possible choice of transportation most convenient to the needs of the traveler"; (3) "[m]odern and efficient commuter rail passenger transportation is important to the viability and well-being of major urban areas and to the energy conservation and self-sufficiency goals of the United States"; and (4) "[g]reater coordination between intercity and commuter rail passenger transportation is required." Finally, to achieve the stated purpose and address the Congressional findings, the Amtrak Act articulates a set of goals related to Amtrak, including: (1) "carry[ing] out strategies to achieve immediately maximum productivity and efficiency consistent with safe and efficient transportation"; (2) "implement[ing] schedules based on a systemwide average speed . . . that can be achieved with a degree of reliability and passenger comfort"; (3) "improv[ing] generally the performance of Amtrak through comprehensive and systematic operational programs and employee incentives"; (4) "maximiz[ing] the use of its resources, including the most cost-effective use of employees, facilities, and real property." 49 U.S.C. § 24101(c)

The Amtrak Act contains, among other restrictions, multiple provisions related to the effect of state or other laws on Amtrak and the ability of a private citizen to file suit. These preemption provisions further the goals stated above by ensuring that Amtrak will be subject to a set of uniform laws. For instance, 49 U.S.C. § 24103 limits the ability of a private citizen to bring a civil action for equitable relief against Amtrak, 49 U.S.C. § 24301(h) exempts Amtrak from any state or local law related to certain pay period laws, 49 U.S.C. § 24301(i) prohibits states from adopting or continuing to force certain laws, rules, regulations, orders, or standards related to employee work requirements, and 49 U.S.C. § 24301(j) exempts a person who is making an agreement with Amtrak from prohibitions of law applicable to an agreement for the joint use or operations of facilities and

equipment. Finally, as relevant to this case, 49 U.S.C. § 24301(g) exempts Amtrak from any state or other law related to rates, routes, or service in connection with rail passenger transportation. That Congress did not intend to preempt all state tort claims is evident from at least one provision of the Amtrak Act. Specifically, 49 U.S.C. § 28103(c) requires Amtrak to maintain liability insurance coverage of at least $200 million per accident or incident. This requirement qualifies the scope of preemption rules stated above and reveals that Congress contemplated the risk of some tort claims imposing liability costs on Amtrak.

Neither Amtrak nor Jenkins consider the purpose, goals, language, or legislative history stated above in support their respective arguments regarding the effect of 49 U.S.C. § 24301(g) on Jenkins' consumer fraud and common law fraud claims. The Court, however, must consider the objectives of the Amtrak Act when considering if the claims "relate[] to . . . service." As discussed in detail below, the Court concludes that Jenkins' common law fraud and consumer fraud claims "relate to . . . service" and are therefore preempted.

*c. Counts IX and X are preempted by the Amtrak Act*

In support of its argument that Jenkins' common law fraud and consumer fraud claims are preempted by 49 U.S.C. § 24301(g), Amtrak argues that this preemption provision should be construed broadly and urges the Court to follow the Supreme Court's decision in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), which dealt specifically with the preemption of a CFA claim under FADA.

In *Wolens*, plaintiffs filed suit, alleging consumer fraud and breach of contract, after defendant American Airlines instituted a program that devalued mileage credits earned by participants in American Airlines' frequent flyer program, imposed controls on the limits of

available seats available to passengers obtaining tickets with the earned credits, and imposed restriction on the dates during which passengers could use the credits. 513 U.S. at 224-25. American Airlines argued that plaintiffs' CFA claims were preempted by the FADA, which preempted state enforcement actions "relating to [air carrier] rates, routes, or services." *Id.* at 226. The Supreme Court agreed, concluding that the CFA "serves as a means to guide and police the marketing practices of the airlines . . . [and] does not simply give effect to bargains offered by the airlines and accepted by airline customers." *Id.* at 228. Thus, in light of the preemption clause and the FADA's purpose "to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing or air transportation services," the Supreme Court concluded that the FADA preempted plaintiff's consumer fraud claims. *Id.*

While *Wolens* is instructive, the Court does not agree with Amtrak's contention that this holding necessarily requires this Court to find both fraud claims preempted by the Amtrak Act. *Wolens* relied on a broad "related to" standard previously set forth by the Supreme Court in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992). The *Morales* court, in turn, relied on a "related to" standard previously set forth by the Supreme Court when interpreting ERISA's preemption clause. As discussed in detail above, the Supreme Court has since narrowed the application of the "related to" standard in the context of ERISA preemption cases such that this Court must now examine the objectives of the statute and the nature of the effect of the state law on Amtrak rates, routes, and service. *See Dillingham*, 519 U.S. at 325. Applying this more limited "related to" standard, the Court concludes that the consumer fraud and common law fraud claims are preempted by the Amtrak Act.

29

With respect to the consumer fraud claim, the Court finds that the claim is premised in part on Amtrak's provision of services to its passengers. To establish a violation of the CFA, the plaintiff must plead and prove, among other things, that the defendant performed a deceptive act or practice in the course of conduct involving trade or commerce. *Gold v. Golden G.T., LLC*, No. 05 C 288, 2005 U.S. Dist LEXIS 22691, at *12 (N.D. Ill. Oct. 4, 2005). The terms "trade" and "commerce" are defined, in relevant part, as "the advertising, offering for sale, sale, or distribution of any *services and any property* . . . [or] thing of value." 815 ILCS 505/1(f) (emphasis added). In this case, Jenkins's consumer fraud claim relies only on Amtrak's provisions of service in connection with rail passenger transportation. (*See* Compl. ¶ 86) (alleging that Amtrak intended that Jenkins rely on the "deceptive and unfair business practices and utilize Amtrak's train services"). In order to prevail, Jenkins must plead and the Court must find that the unfair or deceptive acts occurred in the course of conduct involving Amtrak services. *See Gold*, 2005 U.S. Dist LEXIS 22691, at *12. Thus, because the claim directs the Court's inquiry to the provision of services in connection with rail passenger transportation, this consumer fraud claim "relates to" Amtrak's service. *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990) (wrongful discharge claim preempted by ERISA because it allowed recovery only when plaintiff established that the principal reason for termination was the employer's desire to avoid contributing to or paying benefits under the employee's pension fund and directed the court's inquiry to the ERISA plan).

This reasoning applies with equal force to the common law fraud claim. Because common law fraud is a traditional area of state regulation, Amtrak bears the burden of overcoming the "'presumption that Congress did not intend to supplant state law.'" *Trs. of the AFRA Health Fund v. Biondi*, 303 F.3d 765, 775 (7th Cir. 2002) (*quoting De Buono v. NYSA-ILA Med. & Clinical Servs.*

*Fund*, 520 U.S. 806, 814 (1997)).  However, the fact that states have traditionally regulated such fraud does not necessarily preclude Jenkins's claim from being preempted under § 24301(g), if survival of the claim would thwart the objectives of the Amtrak Act.  *Id.*  Jenkins alleges that Amtrak made various misrepresentations regarding the availability of services (accommodations and facilities) in order to induce Jenkins to purchase Amtrak tickets and travel via Amtrak trains. (Compl. ¶ 79.)  She further alleges that Amtrak failed to provide Jenkins with the appropriate services and accommodations, despite its assurances to the contrary, and that Amtrak knew or should have known that it could not accommodate Jenkins and would not afford her with the appropriate amenities.  (Compl. ¶¶ 8, 11, 13, 77).  In support of its argument, Amtrak contends that there would be no basis for the common law fraud claim had Amtrak provided Jenkins with the promised services.  The Court agrees and concludes that Count IX is preempted by the Amtrak Act. Jenkins must plead and prove that Amtrak told Jenkins that such services would be provided to her during her trip, that Amtrak misrepresented the availability of certain services (including accommodations and facilities), and that Jenkins relied on these misrepresentations by purchasing tickets, retaining the tickets, and boarding the train.  Jenkins would have no cause of action in the absence of Amtrak's provision of service and, therefore, her common law fraud claim is preempted. *Compare Biondi*, 303 F.3d at 781-82 (fraudulent concealment claim not preempted by ERISA where the ERISA plan was only the context in which the fraud occurred), *with Ingersoll*, 498 U.S. at 141 (wrongful discharge claim preempted by ERISA ), *and De Pace v. Matsushita Elec. Corp.*, 257 F. Supp. 2d 543, 570 (E.D. N.Y. 2003) (fraudulent misrepresentation claim preempted by ERISA where claim required plaintiff to prove that a pension plan existed, that defendant misrepresented the terms of the plan, and that plaintiff relied on the misrepresentations).

This conclusion regarding Counts IX and X is reinforced by the objectives of the Amtrak Act. As relevant to this case, these objectives focus on providing and improving the nationwide rail passenger transportation system that Congress initially created to ensure the maintenance of a modern, efficient, and convenient system, and to meet the passenger transportation needs through the use of innovative operating and marketing concepts. The multiple preemption provisions within the Amtrak Act help further these goals by limiting the application of state or other laws as they would apply to Amtrak. Section 24301(g) specifically limits the application of state or other laws relating to services provided by Amtrak in connection with rail passenger transportation. Jenkins' consumer fraud and common law fraud claims thwart these objectives and implicate fundamental concerns of the Amtrak Act. As noted by the *Wolens* court, the CFA "serves as a means to guide and police marketing practices. . . [it] does not simply give effect to bargains offered by [Amtrak] . . . and accepted by . . . customers." *Wolens*, 513 U.S. at 228. To the extent that it focuses Amtrak's alleged fraud, it does so in order to "protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices." 815 ILCS 505/1. In a similar vein, the common law fraud claim also intrudes on the purpose and goals of the Amtrak Act by increasing the risk of conflicting directives between states or states and the federal government with respect to the provision of services and the relationship between passengers and Amtrak. Allowing state claims like this one would subject Amtrak to burdens of state law that Congress sought to foreclose through enactment of the RPSA, the Amtrak Act, and § 24301(g). Thus, because Jenkins' allegations establish the requisite forbidden connection between her consumer fraud and common law fraud claims and Amtrak's provision of rail passenger transportation "service," the Court concludes that Counts IX and X are preempted by the Amtrak

Act.

## CONCLUSION AND ORDER

For the foregoing reasons, Amtrak's Motion to Dismiss Counts I through VI and VIII is denied and the parties are ordered to file its respective summary judgment briefs in accordance with this Opinion and Order.  In addition, Amtrak's Motion to Dismiss Counts IX and X of Plaintiff's Second Amended Complaint is granted and Counts IX and X are dismissed with prejudice.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  January 3, 2008